## COURSEN v. GOODLOE.

No. 3154.

Court of Civil Appeals of Texas.

Waco.

April 8, 1954.

260

C. O. McMillan, Stephenville, for appellant.

H. W. Allen, Hamilton, Fred Harris, Hico, for appellee.

TIREY, Justice.

The plaintiff instituted this suit for an accounting grounded on an oral contract between plaintiff and defendant. The exact terms of this contract are not clear either from the pleadings of the plaintiff or de-fendant. As we understand the contract, the plaintiff was to furnish money with which to buy cattle, the defendant was to furnish pasturage and the labor and other services and look after the cattle, and plaintiff and defendant were to share in the profits from the sales, and in other instances one-half of the increase in the calf crop. Plaintiff specifically alleged that under his contract with defendant he was forced to pay the sum of $1300 for grass lease, which was the obligation of the defendant, and that such sum had not been repaid to him; that he had expended the sum of $155 to replace calves that had died; that he made certain advances to the defendant and itemized these charges, which total $2640.58. He further set out certain credits that were due defendant and itemized them and these total $1534.19; that by reason of the foregoing charges and credits defendant was further indebted to him as of August 31, 1953 in the sum of $1106.39. He prayed that he recover the item of $1300 for the grass lease; the $155 for the calves purchased, and the further sum of $1106.39. Plaintiff verified his petition.

Defendant entered general denial and in addition thereto specially pleaded a cross-action. As we understand defendant's cross-action, he admits substantially the agreement alleged by the plaintiff as to the joint enterprise and says that the joint enterprise became operative between him and plaintiff about May, 1951; that on or about November 1, 1952 he terminated his agreement with plaintiff by stating to the plaintiff he could not continue such arrangement unless plaintiff would pay to defendant $2200 for the lease between November 1, 1952 and November 1, 1953, and that plaintiff did not accept such offer and did not pay the sum of $2200, but that plaintiff continued to use the land for pasturage purposes during the major portion of 1953 and also was using it at the time plaintiff brought his suit in 1953. Defendant sets out certain dealings that plaintiff and defendant had beginning in 1951, after they had engaged in this joint enterprise, alleging that plaintiff bought and sold cattle, some of the operations

being before November 1, 1952, and other purchases of cattle and transactions that took place between plaintiff and defendant after November 1, 1952, and we cannot tell with certainty the measure of recovery that defendant is seeking in his cross-action against plaintiff. It is true that he sues for a rent item for a certain period, based generally on the allegation that the land was under defendant's lease, and that the reasonable rental value for a period of one year was $2200, and that plaintiff had used it against his will for a little less than a year's time after defendant terminated the joint enterprise and he asked for damages in this behalf. He also alleged certain damages by virtue of other transactions he had with plaintiff after November 1, 1952, some of the dates are given in the pleadings and some are not and it is difficult to tell on just what basis he is asking for recovery against plaintiff since defendant claims that the joint venture between plaintiff and defendant had ended as of November 1, 1952. Attached to his pleading is Exhibit A, showing account between plaintiff and defendant. This account consists of 20 separate items. These items bear different dates beginning in 1951, and Item 20 is dated September 1, 1953, which item is to the effect that the rent on the lease from November 1, 1952 to September 1, 1953 is $1833.33. This exhibit lists debits against the plaintiff to the amount of $2493.48 and credits in favor of defendant in the sum of $7268.44, leaving a credit balance due defendant from plaintiff of $4774.96.

The testimony tendered is contained in 149 typewritten pages, legal cap size, and we have read it very carefully. Also tendered in evidence were various exhibits of plaintiff and defendant, some typewritten and some written in longhand, which pertained to the transactions between plaintiff and defendant relating to their dealings in this behalf.

Pertinent to this discussion we quote in part the court's charge:

"Special Issue No. 1: Do you find from a preponderance of the evidence in this case that the lease contract between the plaintiff and defendant, covering what is termed the 'Honey Creek Ranch' was terminated on November 1, 1952?", to which the jury answered "Yes."

"Special Issue No. 2: What do you find from a preponderance of the evidence in this case was the reasonable rental value of said 'Honey Creek Ranch' for the period of time from November 1, 1952 to September 1, 1953?", to which the jury answered "$1833.32."

"Bearing in mind your answers to the two foregoing issues as they may bear upon your answers to the following issues, you will now proceed to answer:

"Special Issue No. 3: In what sum of money, if any, do you find from a preponderance of the evidence that the defendant E. D. Goodloe is indebted to the plaintiff M. S. Coursen growing out of their joint venture in the cattle business and dealings thereto?", to which the jury answered "None."

"Special Issue No. 4: In what sum of money, if any, do you find from a preponderance of the evidence that the plaintiff M. S. Coursen is now indebted to the defendant E. D. Goodloe on his cross-action and growing out of the said joint venture and business and dealings incident thereto?", to which the jury answered "$2595.21."

Plaintiff seasonably filed his exceptions and objections to the court's charge and they are substantially: To Issue No. 1, (a) there is no evidence on which the jury could base an affirmative answer thereto; and (b) the evidence is insufficient to authorize the submission of such issue. To Issue No. 2, (a) the pleadings are insufficient to tender such issue as an ultimate issue of fact; (b) that the evidence is insufficient to authorize the submission of such issue to the jury. To Issue No. 3 that such issue as submitted calls upon the jury to render a general verdict disposing of the rights of the plaintiff and defendant. To Issue No. 4 plaintiff pointed out

that it called upon the jury to render a general verdict. Objection 5 is to the effect that Issue No. 3 calls upon the jury to find the amount of money that defendant is now indebted to Coursen, which includes a finding by the jury on the legal effect of the pleadings and the evidence and that the issue submits a mixed question of law and fact to the jury. Objection 6 is directed to Issue No. 4 and is to the effect that the jury is asked to find what sum of money the plaintiff is indebted to defendant on his cross-action and the effect of the issue as submitted asked the jury which items claimed by the defendant are legal charges against plaintiff, as well as the legal question as to whether such items were properly pleaded, and the further question as to whether or not there is evidence to support such items and by reason thereof Issue No. 4 submits a mixed question of law and fact to the jury.

The court overruled plaintiff's motion for judgment non obstante veredicto and granted defendant's motion for judgment and decreed that defendant Goodloe recover from the plaintiff Coursen the sum of $5525.77, with costs, and directed the clerk of the court to make payment on said judgment the sum of $1017.23 theretofore paid into the registry of the court and dissolve the temporary restraining order theretofore granted.

The judgment is assailed on what appellant designates as 13 points. They are substantially that the court erred (1, 9, 10, 11 and 12) in overruling plaintiff's motion for judgment non obstante veredicto; and that the court erred (2, 3, 4, 5 and 13) in submitting issues Nos. 1, 2, 3 and 4, because the effect of such was to authorize the jury to make an audit of the accounts between plaintiff and defendant and permit the jury to render a general verdict and give to the defendant a double recovery against plaintiff. Points 6, 7, 8 and 14 are substantially to the same effect.

██ Our view of Points 3, 4, 5, 6, 7, 8 and 14 are to the effect that Issues 3 and 4 as submitted amount to a general charge and submit mixed questions of law and fact to the jury and by reason thereof this cause must be reversed and remanded.

██ We have given much consideration to a study of the pleadings, testimony and exhibits introduced and it is our view that the answers of the jury are not supported by the testimony. For example, the jury in its answer to Special Issue No. 1 found that the contract between plaintiff and defendant was terminated as of November 1, 1952. Our view is that this finding is against the uncontradicted evidence. It is true that defendant testified to the effect that he terminated it as of November 1, 1952, but at the same time his testimony shows that there was no accounting between plaintiff and defendant at that time and that plaintiff and defendant continued to carry on their operations and, as we understand the defendant's testimony and the account attached to his pleading, he seeks to recover certain credits and offsets against plaintiff based upon the fact that they were still operating as partners in some respects. Needless to say, plaintiff could not terminate a contract in part and continue to operate under it in other respects and claim profits by reason of the partnership agreement. Neither defendant's pleadings nor the testimony is clear as to what items he seeks to recover under the joint venture, nor those that he claims accrued after the joint venture was terminated. We think defendant's testimony at most tenders an issue that he breached his contract to and with plaintiff. Moreover, he testified, with reference to certain credits listed by plaintiff in his pleadings: "Q. * * * the credits which he lists, are they correct? A. Yes, they are all correct. "Q. Totalling $1534.19? A. Yes, on the settlement in April 1952."

Plaintiff tendered in evidence the following letter written by defendant Goodloe to the plaintiff, dated July 9, 1951:

"Enclosed copies of tickets of each transaction on the cattle, showing purchases, sales and expense. If I missed any expense, please advise.

"This shows the total cost of cattle on hand to be $10,347.39. There are

56 heifers, 6 steers, and 1 bull—a total of 63 head—with an average cost per head of $164.24.

"It rained an inch last Monday. Grass is still in fine shape and the cattle are all doing fine.

"I have a good deal for you here, as soon as you get back, and am very anxious to see you. Parker went back to work for AAA the first of the month. He has so much to look after on his leased land, along with his job, that he propositioned me to sell me his interest in the 120 steers and the farming operation. I believe I could make a good deal with him if it could be done soon. All the steers recovered from the dehorning, branding, and cutting, and are gaining and looking better every day. If we could make a deal with him before he looks them over too close, we can buy him out at a good buy, and clear all the farming expense that has been done so far this year, which would give us about 25 acres maize, 20 acres higeria, and 27 acres cane and sweet sudan broadcast. This is a total of about 72 acres. All has a good stand and excellent prospects for making an above-the-average feed crop. It is planted in crops to go in trench silos. It should make 8 to 10 or 12 tons per acre, but if it averages 6 tons per acre it would be 432 tons of feed, or enough to feed 100 cows about 500 days. Our total cost in the operations to date is $11,804.99, of which $1300.00 is prepaid land lease. This is a cost of $87.54 without the lease and $98.37 with the lease—on 120 steers. *Actually, Parker has $98.37 per head in them which includes his part of the land lease which is paid up to January 5, 1952. All the costs of the farming operations is included in this figure.* (Italics ours).

"I cannot say what he would take, but I can give you some pointers to put to him that will help you drive a good bargain. I think it could be done for about $7.00 per head. Will talk to you more about it when I see you. It would be an excellent chance to get this operation together on a firm basis, with a chance for good profit on the steers about the first of the year.

"I am enclosing a list of equipment etc. which I own and is necessary for the operation. Considering that a dollar is worth possible more in a cow than in equipment, I am cutting the prices of my equipment with this in mind in this valuation. I am sure I am doing this fairly and freely to help us get a sound and safe venture started that can and will grow into something permanent and worthwhile. I will certainly welcome and expect anyone's appraisal on same if we work out anything concerning these assets. * *

"If you are interested in this deal of buying Parker out, I would appreciate you calling me and come down. You may want to go to Stephenville and meet the Productive Credit manager and talk to him some. You can call for me at No. 58 (Duzan Magnolia Service Station) and have the operator to ask Mr. Duzan to look me up and have me call in. I will tell Duzan to look for a call for me from you. * * *

(Signed)   E. D. Goodloe. "

The evidence shows that plaintiff consummated this contract with defendant's brother, whereby he paid a total consideration of $12,600. It appears that defendant thereafter put in a claim of $1522.75 against plaintiff based on rental. Testifying concerning Credit 11, which defendant listed in Exhibit "A", which recites, "Credit lease on cultivated land and farming expense for year of '51, $1522.75", we quote testimony in part relating to this item:

"Q.   You are charging Mr. Coursen up with these items which total $1522.00?   A.   Yes.

"Q.   But these are items of cost that you say was for the most part accrued

before Mr. Coursen came into the deal? A. Yes."

The defendant's testimony with reference to this item of $1522.75 is in irreconcilable conflict with defendant's letter to plaintiff bearing date of July 9, 1951, because after setting out his brother's interest in the 120 steers and also explaining the farming operations and farming expenses and the crops growing, etc., defendant says: "*Actually, Parker has $98.37 per head in them which includes his part of the land lease which is paid up to January 5, 1952. All the cost of farming operations is included in this figure.*" (Italics ours.)

■■ Defendant's testimony with reference to some of the other items listed in his account is not clear. We cannot tell whether he is seeking to recover some of the items on the basis of a joint enterprise, or whether he seeks to recover the reasonable value of the services, since defendant claims that he terminated the contract as of November 1, 1952. Assuming that the jury believed him and that the court found that the contract was terminated as of that date, he would have the duty of showing which part of the account he was entitled to recover on under the joint enterprise and which items he would have the right to recover on the basis of reasonable value. Much of defendant's testimony is controlled by the general rule: "When a party testifies to positive and definite facts which, if true, would defeat his right to recover or conclusively show his liability, and such statements are not subsequently modified or explained by him so as to show that he was mistaken, although testifying in good faith, it has generally been held that he is conclusively bound by his own testimony and cannot successfully complain if he is nonsuited or the court directs a verdict against him." For cases sustaining the above general rule of law see Bergeron v. City of Port Arthur, Tex.Civ.App., 264 S.W.2d 769, the last paragraph in the first column on page 775. We think the above general rule is particularly applicable to the item of $1522.75 herein discussed. Our view is that there are other items in defendant's account that perhaps fall under the same rule.

■■ Since we are of the view that the cause will have to be reversed and remanded, we think that we should refrain from any further detailed discussion of the testimony. In view of the defendant's pleading that his joint venture with plaintiff expired as of November 1, 1952, that the items in his cross-action cannot be proved up by verified itemization as he sought to do in this cause under Rule 185, T.R.C.P. See Willacy County v. Central Power & Light Co., Tex.Civ.App., 73 S.W.2d 1060, point 1, page 1063, writ dis. We do think we should say that the jury's answer to Special Issue No. 3 is without any support in the evidence, and that it amounts to a general charge between plaintiff and defendant, and that Special Issue No. 4 is a general charge as to the controversy existing between plaintiff and defendant.

We think that on another trial the Court should give both plaintiff and defendant an opportunity to replead their respective claims; that this cause is one in which the ends of justice will be better served by a pretrial proceeding; that in the event such pretrial procedure in the opinion of the Court fails to clarify and simplify this complicated controversy between plaintiff and defendant, that he should appoint an auditor to state the account between the parties.

Accordingly, this cause is reversed and remanded with instructions.